1

1        UNITED STATES DISTRICT COURT
          DISTRICT OF SOUTH CAROLINA
2              COLUMBIA DIVISION

3    ---------------------------------

4    UNITED STATES OF AMERICA              CR NO.: 3:14-430
                                           Columbia, SC
5       -vs-                               August 21, 2015

6    RAYCO BETHEA,

7          Defendant

8    ---------------------------------

9

           BEFORE HON. JOSEPH F. ANDERSON, JR.
10       SENIOR UNITED STATES DISTRICT COURT JUDGE
                  SENTENCING HEARING
11

12   APPEARANCES:

13

     FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
14                       UNITED STATES ATTORNEY
                         BY:  WILLIAM K. WITHERSPOON
15                       Assistant United States Attorney
                         1441 Main Street
16                       Columbia, SC  29201

17   FOR DEFENDANT:      JOHN D. DELGADO, ESQ.
                         1614 Taylor Street, P.O. Box 7965
18                       Columbia, SC  29202

19

20   COURT REPORTER:     DANIEL E. MAYO, RDR
                         Certified Realtime Reporter
21                       901 Richland Street
                         Columbia, SC  29201
22

23           STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

24

25

1      THE COURT:  Mr. Witherspoon, please call the first

2  case.

3      MR. WITHERSPOON:  Your Honor, the first case, good

4  morning, is United States of America versus Rayco Bethea,

5  criminal action number 3:14-430.  Mr. Bethea is present with

6  his attorney John Delgado.  We're here for sentencing.

7      Your Honor, the government has reviewed the

8  presentence report.  As of last week -- as of this morning the

9  government wants to raise one objection.  I have discussed it

10  with Probation.  It's dealing with paragraph 81 and 82.  I'll

11  tell the court, no matter how the court rules, if there's an

12  acceptance of responsibility I don't think it affects what the

13  court has to do today, but I would like to put it on the

14  record.  We do object to the acceptance of responsibility and

15  I will be glad to explain why when appropriate.

16      THE COURT:  It would be a late objection.  Is it

17  because of conduct that's occurred recently?

18      MR. WITHERSPOON:  Yes, sir.

19      THE COURT:  I normally don't call time on a

20  sentencing because technically the rules say ten days from the

21  time the presentence report is submitted.  I never call time

22  on the defendant, I'm not sure if I -- let me just defer on

23  that.  We will hear the facts and go forward.

24      Mr. Delgado, good morning.

25      MR. DELGADO:  Good morning, your Honor.

1          THE COURT:  Have you had enough time to read over the

2     presentence and discuss it carefully with Mr. Bethea?

3          MR. DELGADO:  I have, sir, yes.

4          THE COURT:  The probation officer indicates in the

5     addendum that you do not have any objections to the report, is

6     that correct?

7          MR. DELGADO:  That is correct, sir.

8          THE COURT:  All right.  Very good.  Let me speak to

9     Mr. Bethea.  Mr. Bethea, have you had enough time to read over

10    the report and discuss it with Mr. Delgado?

11         DEFENDANT:  Yes, sir.

12         THE COURT:  You understand this is an important

13    document in terms of helping me decide upon a sentence in you

14    case?

15         DEFENDANT:  Yes, sir.

16         THE COURT:  Mr. Delgado just told me that you do not

17    have any objections to the factual statements or guideline

18    calculations in the report, is that correct?

19         DEFENDANT:  Yes, sir.

20         THE COURT:  Do you agree with that statement by your

21    lawyer?

22         DEFENDANT:  Yes, sir.

23         THE COURT:  Very good.  You can be seated.  All

24    right.  Mr. Witherspoon, let me hear what you've got to show

25    me here.

4

1          MR. WITHERSPOON:  Your Honor, on last August 12 Mr.

2    Bethea and Mr. Delgado and I met at the FBI office.  The

3    government had learned through sources that Mr. Bethea, since

4    he pled guilty in February, had continued to cook crack

5    cocaine.  We confronted Mr. Bethea last week.  Initially he

6    denied participating in any criminal activity until we were

7    about to polygraph him, at which point he then admitted that

8    since he pled guilty in February that he has been cooking

9    crack cocaine in his house that he lives with his wife and

10   eight children three times a week for an individual up to one

11   ounce each time.

12          THE COURT:  Not for personal use but for others.

13          MR. WITHERSPOON:  For others.  We didn't learn this

14   until three weeks ago.  We confronted him last week, at which

15   time he admitted it.  And for those reasons, Judge, if you

16   look at 3E1.1, application note 1(b), voluntary termination or

17   withdrawal from criminal conduct or association, by his own

18   admittance he did not do that.  Three times a week since

19   February after he pled guilty up until three days prior to

20   when we met with him on August 12.

21          THE COURT:  And my presentence report is dated

22   August 13, is that right?  I was about to ask you, did you

23   learn about this long after the presentence report was issued?

24          MR. WITHERSPOON:  Judge, I'm not sure when -- mine is

25   not dated August 13.

1           THE COURT:  I'm sorry, that's when it was clocked in
2   with the clerk.
3           MR. WITHERSPOON:  Mine is dated July 22.
4           THE COURT:  So the reason for the late objection is
5   the fact that this conduct occurred very recently, or you
6   learned of this conduct very recently.
7           MR. WITHERSPOON:  Last week.
8           THE COURT:  All right.  Well, in the total scheme of
9   things -- I'm familiar with the case, and the government was
10  prepared to drop two priors and recommend a downward
11  departure.  I guess all that is off the table now?
12          MR. WITHERSPOON:  Yes, sir.
13          THE COURT:  Well, then is it just an academic
14  exercise as to whether he gets acceptance or not?
15          PROBATION OFFICER:  I wanted the court to know the
16  previous report was revised August 7.
17          THE COURT:  Had a revision August 7.  Can you tell
18  what it dealt with?
19          PROBATION OFFICER:  Revising codefendant information
20  and paragraphs with his personal history.
21          THE COURT:  All right.  Mr. Witherspoon, does --
22          MR. WITHERSPOON:  Judge, with the changes in the
23  laws, we have seen over the last ten years it is just a
24  technical change.  However, I do like to have it on the record
25  that I am objecting to that issue.  And I understand the

6

1    court's position, you can certainly deny it, but I don't think

2    that's going to prevent you from doing what you have to do in

3    this case.  But I do want to raise that issue with the court,

4    given what we found last week.

5         THE COURT:  Normally this would have been a mandatory

6    detention case when he pled guilty.  I'm assuming I was

7    persuaded to leave him out because of his medical condition.

8         MR. WITHERSPOON:  And let me explain all of that.  We

9    initially moved, Judge, to detain him.  Subsequent to him

10   being detained by the magistrate he was called and had a

11   kidney available for him.  Because of that reason I withdrew

12   my motion for detention in hopes that he could get a kidney

13   during the time when this was pending and also to give him an

14   opportunity to help himself, because I knew he was looking at

15   a mandatory minimum.  That has not happened.

16        Neither has he been, as Mr. Delgado states in his

17   sentencing memorandum, he's on an inactive list, which means,

18   as I understand, because he was not available to get a kidney

19   when it was available they knocked him down the list and more

20   tests and other things had to happen.  We kept -- I asked that

21   he stay out when he pled guilty, again, in hopes that he would

22   get a kidney and in hopes that he could do what he had

23   promised to do to help himself.

24        THE COURT:  In terms of cooperation against other

25   people?

 1              MR. WITHERSPOON:  They were expecting him to do

 2    cooperation against other people.

 3              THE COURT:  Well, go back.  You said you initially

 4    wanted him detained.  That was not in front of me.

 5              MR. WITHERSPOON:  In front of the magistrate.

 6              THE COURT:  When I took his guilty plea --

 7              MR. WITHERSPOON:  I asked for him to be continued on

 8    bond.

 9              THE COURT:  That's what I thought.  I never locked

10    him up.

11              MR. WITHERSPOON:  No, sir.  I asked him to be

12    continued on bond in hopes of a kidney transplant and also

13    that he could cooperate and help himself so we wouldn't be

14    here where we are today.  Unfortunately, he didn't take

15    advantage of that, he continued his criminal activities.  And

16    so, yes, sir, this is a Mandatory Detention Act case.

17              THE COURT:  So you say he admitted his crack

18    activities on the threshold of taking a polygraph.

19              MR. WITHERSPOON:  Sitting in the polygraph chair.

20              THE COURT:  All right.  Mr. Delgado, I'll be glad to

21    hear from the defendant on this objection.

22              MR. DELGADO:  Your Honor, I must say to you, sir, I

23    can't in good faith say to you there can be an objection.  I

24    think, as the court has said, literally I think this was

25    within ten days ago of today's sentencing.  I'm just

1    constrained, your Honor, to be able to say to you I just could

2    not believe in good faith I can object to that, simply because

3    I believe it to be the law and I think the court's bound by

4    it.

5         THE COURT:  All right.

6         MR. DELGADO:  It's hard to say that.

7         THE COURT:  This is a sad day, it really is, because

8    it looks like everybody tried to give Mr. Bethea the benefit

9    of the doubt.  And looking back it may well have been much

10    better off to be in custody so he couldn't stay out cooking

11    this crack.

12         MR. DELGADO:  Your Honor, I must say for the record,

13    and I hope Mr. Nettles hears about this, Mr. Witherspoon has

14    been extraordinarily professional in this matter, accessible,

15    helpful, understanding and, to be candid with you, he

16    continued to gently probe and asked the defendant for

17    assistance.  I was as stunned as the government was --

18    apparently the government had some idea that some of this was

19    going on last week.  I didn't have the slightest idea about

20    that.  Your Honor, I'm sorry to say that in hindsight I guess

21    we're always perfect, but perhaps that could have been, yes,

22    sir.

23         THE COURT:  Right.  Well, Mr. Bethea, let me hear

24    from you.  The government has objected to you getting a

25    reduction in your offense level for acceptance of

9

1    responsibility because of your continued criminal conduct

2    while you were out on bond.  Anything you want to say about

3    that I'll be glad to hear from you.

4         DEFENDANT:  Yes, your Honor.  I just want to say

5    that, you know, before all this happened, you know, before my

6    health and everything I used to be a hard worker, a good

7    worker.  And when my health shut down, when I couldn't work

8    anymore I didn't have no other way of making any money.

9    Trying to help my family because I couldn't do anything.

10        I mean, I have six kids and a wife.  What I done I

11   know was stupid.  And I talked to my kids yesterday and I told

12   them what I was facing.  I told them I was facing life, it

13   didn't look good, with them yesterday.  That was the hardest

14   thing I ever had to say to my kids.

15        I left them this morning and I told them I loved

16   them, I told my kids I would try to do anything, anything to

17   cooperate with the federal government and to reduce my life

18   sentence, anything for my kids and my wife.

19        Your Honor, if you can just spare me.  Once again,

20   I'm stunned, I'm nervous, I'm scared of not seeing my kids

21   anymore.  If you can just spare me.

22        THE COURT:  All right.  We're still on the objection

23   by the government to acceptance of responsibility right now.

24        Mr. Witherspoon, anything in reply on that issue?

25        MR. WITHERSPOON:  Nothing, your Honor.

1          THE COURT:  Well, I have traditionally allowed

2     defendants to file late objections, notwithstanding our local

3     rule for filing for a ten-day window.  I'm not sure if I ever

4     had it come up with the government, but I'm going to follow

5     that same rule and allow the filing of a late objection,

6     primarily because this conduct came to light after the

7     presentence report was drafted and Mr. Witherspoon would have

8     timely objected had he known about the misconduct.  So the

9     government's objection is sustained.

10          And it may all be academic but, as Mr. Witherspoon

11    said, things are happening so fast in Washington now regarding

12    criminal sentencing I think we need a clean record of how we

13    stand in case this mandatory life sentence is ever changed by

14    statute retroactively.  So if the probation officer could tell

15    us the new guideline calculations.

16          PROBATION OFFICER:  Your Honor, with no acceptance

17    the total offense level will become 32, the criminal history

18    category will remain three, the guideline sentence remains at

19    life.  Otherwise, absent the mandatory minimum term it would

20    have been 151 to 188 months.

21          THE COURT:  It would have been 151 to 188.

22          PROBATION OFFICER:  Yes, your Honor.

23          THE COURT:  With only one prior felony --

24          PROBATION OFFICER:  With all priors.

25          THE COURT:  Counting all three.

1          PROBATION OFFICER:  Yes, sir.

2          THE COURT:  So the statute makes it mandatory life,

3    not the guidelines.

4          PROBATION OFFICER:  Yes, sir.

5          THE COURT:  All right.  Well, I will sustain the

6    government's objection and I adopt the guideline provisions

7    just announced by the probation officer.  So we're looking at

8    the following, assuming that the three prior felony

9    convictions stay in the case.  Mr. Witherspoon, the government

10   is formally declining to drop two.

11         MR. WITHERSPOON:  We are, your Honor.

12         THE COURT:  Because --

13         MR. WITHERSPOON:  By him violating the plea

14   agreement.

15         THE COURT:  Did not comply with the plea agreement.

16   And the government is not making a motion for downward

17   departure.

18         MR. WITHERSPOON:  No, sir, not at this time.

19         THE COURT:  So we're looking at the following then.

20   With the three prior felony drug convictions on the

21   defendant's record the statute requires a mandatory life

22   sentence.  The statute requires a period of supervised release

23   if the defendant is ever released of at least ten years, the

24   fine could be up to $20 million, and a special assessment of

25   $100.

1        Under the guideline provisions the offense level

2    would be 32, the criminal history category would remain a

3    three.  The defendant would not be eligible for straight

4    probation.  The guideline range would be life, and supervised

5    release, if the defendant is ever released, would be at least

6    ten years.  The fine was not calculated due to inability to

7    pay, and the special assessment is $100.

8        All right.  Anything from the government on

9    sentencing generally?

10        MR. WITHERSPOON:  Nothing at this time, your Honor.

11        THE COURT:  All right.  Mr. Delgado?  This is one of

12    the saddest cases I've had in a long time.  Because everybody,

13    as I said earlier, everybody in this courtroom is trying to

14    help the defendant and he just made some foolish decisions

15    while he was on bail.

16        MR. DELGADO:  I absolutely concur in that, your

17    Honor.  I can't recall a night that I've had -- I must have

18    tossed and turned all night thinking about this morning.

19        THE COURT:  I'll be glad to recommend the facility

20    that you requested.  Where was it?  Philadelphia, maybe?

21        MR. DELGADO:  Devens, Massachusetts.

22        THE COURT:  All right.

23        MR. DELGADO:  Your Honor, one last thing, and again I

24    feel I have to say something.  Again, it runs counter to what

25    the facts have indicated over the past, well, as a result of

1    the debriefing this past week at the FBI office.  I must ask

2    for this, your Honor.  Would the court consider continuing him

3    on bond and allow him to self-report?  The reason I say that,

4    your Honor, is that yesterday he had dialysis treatment, he

5    has dialysis treatment tomorrow, he has it next Tuesday, next

6    Thursday, next Saturday.  Dialysis is absolutely mandated

7    because of his medical condition that's noted in the

8    presentence report as well as my memorandum.

9           THE COURT:  Tell me again how frequently he gets

10   treatment?

11          MR. DELGADO:  Three times a week, sir, Tuesdays

12   Thursdays and Saturdays.  This has been going on since March,

13   your Honor.  As a matter of fact, a couple of times through

14   Miss Floyd we had to reschedule some, I think a sentence -- I

15   mean the guilty plea because he was in dialysis.

16          Your Honor, this is -- let me just show you, your

17   Honor.  When I say something in words, your Honor, you can't

18   begin to understand what this problem has meant to this man,

19   notwithstanding everything else he's said and done and

20   admitted to.  You might even be able to see from your vantage

21   point.

22          This is called a fistula, an artificial port that the

23   urinalysis takes place through.  In other words, it flushes

24   him four hours, three times a week.  He's been doing this

25   since March and he's going to have to continue that.  That's

1    the reason I ask the court and was able to find out through

2    Miss Shealy and Will, as well, about the FMC in Devens, which

3    is recommended for this sort of thing.

4         My point is this, your Honor.  I can only tell you

5    that I don't know when individuals in their own way come to an

6    ultimate fork in the road.  But it may be, it may be, may be

7    that within the next month to six weeks if he is left out to,

8    first of all, facilitate his own medical needs, as he has been

9    since March, maybe a downward departure might be something the

10   government would look at again.

11        THE COURT:  What would be?

12        MR. DELGADO:  A downward departure based on

13   substantial assistance may be something the government would

14   look at again.  I can't promise that.  I know the government

15   stands --

16        THE COURT:  You realize you are asking for a highly

17   unusual measure for somebody facing a mandatory life to stay

18   out on bond.

19        MR. DELGADO:  Yes, sir, I understand that.  I feel

20   like I must say something, your Honor.  Yes, sir, I

21   understand.  I certainly do.

22        THE COURT:  Let me interrupt and ask the Marshal,

23   assume that he's designated to Devens, Massachusetts, how long

24   would it take.

25        MARSHAL:  May I approach, your Honor?

1          THE COURT:  Yes, sir.

2          (There was a pause in the proceedings)

3          THE COURT:  The Marshal just informed me that they

4    anticipated this problem and I was just told that there's a

5    facility in Charleston County run by the state that has agreed

6    to let the Marshals bring the defendant down there and they

7    administer dialysis there in the facility.  They normally

8    don't do it on Saturday but the Marshal has been proactive and

9    asked them to make arrangements to have someone come in on

10   Saturday to do the treatment.  So he will not miss a beat,

11   assuming I don't take him into custody, it will not endanger

12   his health because he will get the dialysis treatment he needs

13   tomorrow and thereafter.

14         MR. DELGADO:  Yes, sir.  I understand.

15         THE COURT:  Then we're back to the suggestion he

16   needs to stay out to try to cooperate and provide substantial

17   assistance.  And I guess I need to hear the government.

18         MR. WITHERSPOON:  Judge, this is a Mandatory

19   Detention Act case and we ask he be taken into custody.

20         THE COURT:  All right.  Mr. Delgado, I interrupted

21   you.  Go ahead.

22         MR. DELGADO:  No, sir.  I'm sorry.  This is a

23   difficult case, your Honor.  I don't know what to say to you.

24   And I understand the quandary the court is in and I understand

25   the necessity of providing care and treatment.  It's a very,

1    very, very difficult situation, yes, sir, I agree with the

2    court.

3              THE COURT:  All right.  Well, let me speak to the

4    defendant.  Mr. Bethea, you have a right under our rules of

5    procedure to make any statement that you wish regarding your

6    case before I impose a sentence.  I'll be glad to consider

7    carefully anything you tell me.

8              You've already gotten into it to some extent when we

9    were talking about the downward departure, but if there's

10   anything else you want to cover I'll be glad to hear from you.

11             DEFENDANT:  Again, I --

12             THE COURT:  That microphone will pick up what you

13   say, you don't have to bend over like that.

14             DEFENDANT:  For my kids' sake, you know, if I can

15   just stay out, and I'm willing to cooperate with the

16   government.  Whatever I need to do to work off the life

17   sentence I will do it, your Honor, for my kids and my wife.

18             THE COURT:  All right.  Thank you, sir.  Mr.

19   Witherspoon?

20             MR. WITHERSPOON:  May I just address something

21   shortly, Judge?  I am full of emotions today.  This is -- I

22   never thought this day would come.  When we allowed him out in

23   February he promised that he would work and cooperate with us

24   because he knew he was facing a life sentence.  As the court

25   observed in the presentence report, I mean in the plea

1    agreement, this is an unusual plea agreement for me.  I was

2    willing to drop two enhancements, which would take the

3    mandatory life off the table, put him at a 20 year sentence

4    and give him a downward departure just for his cooperation.

5        He got out, and Mr. Delgado mentioned, there were

6    several times between February and today that I would send

7    Mr. Delgado e-mails and say hey, tell Rayco he needs to call

8    us, he's facing a life sentence, he needs to cooperate, he

9    needs to do something.  The only time Mr. Bethea met with us

10   were the two times that I called him in where I learned that

11   he was not being honest and truthful with us.  And both times

12   he sat there in a chair across from me and lied to me.  Until

13   he had to sit in the polygraph chair.

14       Now he says that he wants to stay out so he can do

15   what he could for his children.  By his own admission, Judge,

16   three times a week since February when his wife and his

17   children would leave the house he would bring drug dealers

18   into his house and use his house to cook crack cocaine.  I'm

19   not sure I can use him at this point.  Anybody that I used him

20   against I'm going to have to disclose to the defense he lied

21   and he continued to violate the conditions of his bond.  You

22   have seen juries and how defendants, cooperating witnesses are

23   beaten up on the stand.  I'm not sure I can use him at this

24   point.  He's concerned about his children today but for the

25   last six months he was concerned about cooking crack cocaine

1    for these other drug dealers.

2         Judge, the Mandatory Detention Act says he needs to

3    be taken into custody.

4         THE COURT:  All right.  Well, Mr. Bethea, I'm going

5    to impose the required statutorily required sentence.  I'm

6    going to make sure you get down to Charleston today so that

7    you can get your dialysis tomorrow.  And it will continue

8    uninterrupted three times a week until you go to the facility

9    hopefully in Devens, Massachusetts.  I'm going to make a

10   strong recommendation in the presentence report that you go

11   there.  Mr. Delgado said they would be better than Butner to

12   treat you for your problem.

13        You made your own bed, Mr. Bethea.  You had a

14   wonderful opportunity to get out from under this life sentence

15   down to 20 years and perhaps even lower than that, but you

16   yourself made these poor decisions and my hands are tied.

17        There's a possibility, there's a lot of movement in

18   Washington to do away with these mandatory sentences and if

19   that ever happens you may benefit from it.  So maybe there's a

20   little ray of hope for you there.  But I'm required by statute

21   to impose a sentence.

22        So having calculated and considered the advisory

23   sentencing guidelines, having carefully considered the Section

24   3553(a) factors as well as the statutory provisions for a

25   mandatory sentence in this case, it is the judgment of the

1    court that the defendant Rayco Bethea is hereby committed to

2    the custody of the Bureau of Prisons to be imprisoned for a

3    term of life.  According to the Fourth Circuit decision in

4    United States versus Kratsas I find that when the defendant is

5    facing a sentence of life I must apply the three-part test in

6    the Solem decision, recognizing that an extensive

7    proportionate analysis is required in cases involving life

8    sentences.

9         Applying the first prong of the Solem case, the

10   defendant's offense was extremely grave because, number one,

11   drug use is a pervasive destructive force in American society,

12   the defendant was not merely a user or even a single

13   distributer of drugs but was a major supplier of both powder

14   and crack cocaine in the state of South Carolina.  He

15   purchased and then converted to crack a total of 598.81 grams

16   and was involved in the purchase of another 16,376.3 grams of

17   powder cocaine.

18        Applying the second prong of the Solem decision, I

19   find that a life sentence for a major drug violation such as

20   this is not disproportionate in comparison with other

21   sentences under the guidelines.

22        In applying the third prong I find a review of the

23   state statutes within this circuit disclose the existence of

24   similarly severe sentences for narcotics violations of the

25   magnitude involved here.

1          Do we have any forfeiture issues in this case, Mr.
2    Witherspoon?
3          MR. WITHERSPOON:  Judge, we move to dismiss the
4    forfeiture and any other counts.
5          THE COURT:  On motion of the government the
6    forfeiture allegations and any other counts still alive are
7    dismissed with prejudice.  I find that Mr. Bethea does not
8    have the ability to pay a fine, therefore the fine is waived.
9    He shall, however, pay the mandatory special assessment of
10   $100, which is due immediately.
11         Should the defendant ever be released from
12   imprisonment the defendant shall be placed on supervised
13   release for a term of ten years.  Within 72 hours of his
14   release from custody of the Bureau of Prisons the defendant
15   shall report in person to the probation office in the district
16   to which he is released.
17         While on supervised release the defendant shall
18   comply with the mandatory and standard conditions of
19   supervision outlined in Section 3583(d) of Title 18 and also
20   the following special condition:  The defendant shall
21   participate in a program of random drug testing as approved by
22   the probation office and shall contribute to the cost of such
23   program in an amount determined reasonable by this court at
24   the time of the program.  He shall also cooperate in securing
25   payment from any third parties, such as insurance or Medicaid.

1            Mr. Bethea, you signed a plea agreement waiving your

2    right to appeal your conviction and your sentence.  Only in

3    very narrow circumstances may a defendant who has waived his

4    appeal rights in this fashion nevertheless pursue an appeal.

5    You should discuss with Mr. Delgado whether you have any

6    grounds for appeal and also whether an appeal would be in your

7    best interest or not.

8            If you wish to appeal and cannot afford an attorney

9    the court would appoint one for you.  If you wish to appeal

10   you'd have to file your notice of appeal within 14 days from

11   the day the judgment order containing your sentence is filed

12   with the clerk.

13           I'm obviously not going to allow him to remain out on

14   bond pending designation of the institution.  The Marshal

15   assured me adequate preparations have been made and he will be

16   taken to Charleston forthwith, receive his treatment tomorrow,

17   and periodically three times a week thereafter until he goes

18   to the facility.

19           I'm going to strongly recommend that he be

20   incarcerated in the facility in Massachusetts, Devens,

21   Massachusetts, which Mr. Delgado says is the institution best

22   equipped to treat him for his condition.

23           My reasons for imposing this sentence are as follows:

24   I have sentenced at the mandatory life sentence called for by

25   the statute, also considered the proportionality analysis

1  required by law.  I've considered all the 3553(a) factors,

2  which are set out in detail in the presentence report and

3  incorporated herein by reference.

4       Regarding the nature and circumstances of the

5  offense, I've already detailed the defendant's extensive

6  involvement in both powder and crack cocaine.  As to the

7  history and characteristics of the defendant, he has a large

8  family, he has a substantial criminal history involving

9  drug-related crimes.  He has a severe medical problem that is

10  mentioned in-depth in the presentence report and I'm fully

11  aware of his medical needs and his family situation.

12       I've also obviously considered the fact that he

13  continued to engage in illegal conduct after receiving a very

14  gracious consideration by the government for letting him stay

15  out on bond pending sentencing when technically the Mandatory

16  Detention Act would have required him to go into custody.

17  That was done for his benefit because of his medical reasons

18  and also it allowed him time to cooperate and provide

19  information on other illegal activity of which he was aware.

20  He did not avail himself of that gesture and finds himself

21  back here today looking at a mandatory life sentence.

22       I've also considered, as required, the need for the

23  sentence imposed to reflect the seriousness of the offense, to

24  promote respect for the law, and to provide just punishment

25  and to protect the public from future crimes of the defendant.

1    Those are all my reasons.  Thank you very much.  We will be in

2    recess.

3               (Recess, 10:12 a.m.)

4

5

6

7               I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

8

9    Date:  2-10-18                    s/  Daniel E. Mayo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25