```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
2                     COLUMBIA DIVISION

3
   UNITED STATES OF AMERICA,        )
4                                   )
            Plaintiff,              )  CR No. 3:14-cr-00430
5                                   )
            vs.                     )  Columbia, SC
6                                   )
                                    )
7   RAYCO BETHEA,                   )
                                    )
8            Defendant.             )
   _____)  DATE:  March 31, 2021
9

10          BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR
             UNITED STATES DISTRICT JUDGE, PRESIDING
11                      MOTION HEARING

12

13   A P P E A R A N C E S:

14

   FOR THE PLAINTIFF:
15
   WILLIAM KENNETH WITHERSPOON
16   US Attorneys Office
   1441 Main Street, Suite 500
17   Columbia, SC 29201

18

   FOR THE DEFENDANT:
19
   ANDREW ROSS MACKENZIE
20   Barrett and Mackenzie Law Firm
   100 Mills Avenue
21   Greenville, SC 29605

22

   COURT REPORTER:                  KAREN V. ANDERSEN, RMR, CRR
23                                  United States Court Reporter
                                    901 Richland Street
24                                  Columbia, SC  29201

25
```

1          THE COURT:  Mr. Witherspoon, please call the case

2     this morning.

3          MR. WITHERSPOON:  Your Honor, next case is United

4     States of America v. Rayco Bethea, Criminal Action No.

5     3:14-430.  Mr. Bethea is present via video from Springfield,

6     Missouri.  He's present.  In the courtroom for him is Andrew

7     Ross Mackenzie, his attorney.  Your Honor, we are here for a

8     resentencing in this case after the case was -- prior

9     sentence was vacated and sent back by the Fourth Circuit.

10         THE COURT:  I'm not sure it's necessary, but out of

11    abundance of caution, let me put this admonition on the

12    record.  Pursuant to Rule 5(f) of the Federal Rules of

13    Criminal Procedure, the United States is ordered to produce

14    all exculpatory evidence to the defendant pursuant to *Brady*

15    *v. Maryland* and its progeny.  Not doing so in a timely manner

16    may result in sanctions, including the exclusion of evidence,

17    adverse jury instructions, dismissal of charges, and contempt

18    proceedings.  In accordance with the recently passed statute,

19    I will enter a written order memorializing this oral warning

20    to the Government.

21         Mr. Mackenzie, good morning.

22         MR. MACKENZIE:  Good morning, Judge.

23         THE COURT:  Mr. Bethea, can you hear me effectively?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  I want to be sure before we begin, Mr.

1    Bethea, that you understand very clear that you have an

2    absolute right to be present here in the courtroom for this

3    resentencing proceeding.  And, indeed, to that end, the

4    Government had already made preparations, made plans and

5    purchased a ticket to fly you here on a medical-type flight

6    at pretty significant expense to the Government so that you

7    could be present.  And some time midweek last week, we

8    received an information from your attorney, Mr. Mackenzie,

9    that you preferred to stay there and participate in this

10   proceeding by satellite communication so that you could stay

11   there at the prison and get your dialysis treatments; is that

12   correct?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  All right.  I want to be absolutely sure

15   you understand that I can call this off right now and we can

16   bring you here if you want to be here in person.  But you

17   have a right to participate by satellite if you wish to do

18   so.  Did you discuss this matter carefully with Mr.

19   Mackenzie?

20            THE DEFENDANT:  Yes, Your Honor, I did.

21            THE COURT:  All right.  And did you consider your

22   right to come here in person?

23            THE DEFENDANT:  I told him I wanted to do video

24   because of the girls when they came and got me, the places

25   they took me at didn't have any dialysis treatment.  So when

1    they took me to Oakland, they had to turn me back around and

2    bring me back because they didn't have no dialysis.  And then

3    again they said they had a place to go in Auburn, South

4    Carolina.  They didn't have dialysis.  So I just told Mr.

5    Mackenzie, hey, let's just do the video so I can make sure I

6    get my treatment, because I didn't want to go anywhere

7    without getting my treatment.  So I asked if we could do a

8    waiver so we could do a live video.

9          THE COURT:  I'm not sure I can go forward with this

10   record being put on the record that he can't get dialysis if

11   he's transported here.  Is the marshal present?

12         THE COURT DEPUTY:  No, sir.  But they told me that

13   if he needed dialysis, they would take him to the emergency

14   room and the emergency room would provide the dialysis, is

15   what I was told by Chris Wolf of the U.S. Marshals office.

16         THE COURT:  Well, I've already been reversed once

17   because of this very issue of whether the defendant could be

18   here or not.  And I don't want to get reversed twice on the

19   same issue.

20         Mr. Mackenzie (sic), we can get you here and we can

21   get you dialysis -- I'm sorry.  Mr. Bethea, we can get you

22   here and we can get you dialysis.

23         THE DEFENDANT:  I just want to go on with the video,

24   Your Honor.

25         THE COURT:  Mr. Bethea, there's a rule of criminal

1    procedure that says you must be present for all critical

2    stages of the proceedings against you.  A resentencing is a

3    critical stage.  I just do not feel comfortable going forward

4    with you telling me that you consent to participate by

5    satellite but only because you can't get dialysis on the way

6    here and after you get here.  You can receive your dialysis

7    treatment.  We can make that happen.  And we will make it

8    happen.

9            THE DEFENDANT:  Yeah, I know.  But, Your Honor, I

10   prefer the satellite.

11           THE COURT:  I hear you saying that, but I am not

12   going to get reversed twice in this case, Mr. Bethea.  We can

13   get you -- we can bring you here and get you dialysis

14   treatment.

15           THE DEFENDANT:  I understand, Your Honor.  But I

16   would rather do it by satellite.

17           THE COURT DEPUTY:  Do you want me to call the

18   marshals up here?

19           THE COURT:  Yes.

20           THE COURT DEPUTY:  Okay.

21           THE COURT:  Mr. Bethea, you said you had been

22   transported somewhere before and you did not get dialysis

23   when you were transported?  What was that for?  What was that

24   transportation for?

25           THE DEFENDANT:  Well, the first one was in Oakland.

1    They took me.  I think it was like a holdover.  And they said

2    they didn't have dialysis treatment.  So they brought me

3    back.

4            THE COURT:  Why were you being transported away from

5    your prison facility?  That's my question.

6            THE DEFENDANT:  I haven't the slightest idea, Your

7    Honor.

8            THE COURT DEPUTY:  The marshal's on his way.

9            THE COURT:  Mr. Mackenzie, I'm just concerned about

10   going forward on this record.

11           MR. MACKENZIE:  I understand.

12           THE COURT:  I do not want him to take an appeal

13   telling the Fourth Circuit that I, by not ensuring the

14   dialysis treatment, I caused him to forego his right to be

15   present.  That's basically what he told me.  The marshal told

16   me he would get dialysis treatment --

17           MR. MACKENZIE:  Yes, sir.

18           THE COURT:  -- while he was here.

19           MR. MACKENZIE:  I don't know.  I don't know the

20   circumstances.  I don't know what was said to him, Your

21   Honor.  I'm sorry.

22           THE COURT:  Let's wait until the marshal gets here.

23           THE COURT DEPUTY:  This is Chris Wolfe.

24           THE COURT:  Mr. Wolfe, good morning.

25           MR. WOLFE:  Yes, sir, Your Honor.

1    THE COURT:  I asked you to come up to the courtroom.

2    We are about to begin a criminal resentencing with Mr. Bethea

3    who is incarcerated at a federal prison facility.  And last

4    week he, through his attorney, he signed a waiver of

5    appearance indicating he wanted to participate by satellite.

6    And as we began proceeding this morning, I asked Mr. Bethea

7    if it was with his full consent that we go forward with

8    satellite rather than inconference hearing.  And he said yes,

9    but.  He said, yes, I'm satisfied, but the reason I'm

10    agreeing to do that is I can't get dialysis treatment while

11    I'm being transported.  And I'm concerned that on that

12    record, I'm concerned about my ability to go forward.

13    So can you tell me, would he get dialysis treatment

14    if he were brought here?

15    MR. WOLFE:  Yes, sir, he would get dialysis if he

16    were brought here.  And I would just ask him who would tell

17    him that, because we would -- you know, in the means we would

18    transport him, we would have two deputies fly commercially,

19    pick him up, bring him here, and we had all the logistics

20    worked out.

21    THE COURT:  How long would the flight take to get

22    him here?

23    MR. WOLFE:  Round-trip, it was about eight hours.

24    THE COURT:  I'm talking about one way.

25    MR. WOLFE:  One way with the layovers and transfer,

1    probably about eight hours.

2        THE COURT:  All right.  And so I'm just assuming he

3    could get a dialysis treatment at the prison.  And then you

4    could have him in Columbia, South Carolina, eight hours

5    later.

6        MR. WOLFE:  Yes, your Honor.

7        THE COURT: And he gets dialysis three days a week,

8    so you should have plenty of time to get him a second

9    treatment after he gets here?

10        MR. WOLFE:  Yes, sir, that's correct.

11        THE COURT:  Mr. Mackenzie, I think we've got to

12    adjourn this hearing and get him here.

13        MR. MACKENZIE:  I will follow your instruction,

14    Judge.

15        THE COURT:  Mr. Witherspoon, does the Government

16    have a position?

17        MR. WITHERSPOON:  We do not, Judge.

18        THE COURT:  All right.  We will reschedule this

19    hearing.  How much lead time do we need to get plane flight

20    rescheduled and so forth?

21        MR. WOLFE:  Your Honor, we will do it as quickly as

22    the Court would like to schedule it, couple weeks advance

23    notice.

24        THE COURT:  We will probably schedule a month down

25    the road.

1          MR. WOLFE:  That would be great.

2          THE COURT:  Mr. Mackenzie, I know you drove down

3    here from Greenville this morning.  We appreciate your

4    involvement in this case.  I just think the safe thing to do

5    is get him here.  If he says he wants to be here and he would

6    be here but for the dialysis treatment, it's not a problem.

7    We can get him dialysis while he's here.

8          Is it a commercial flight or a private flight or

9    what type flight?

10          MR. WOLFE:  We will be flying him commercially, and

11    then both ways here and there.

12          THE COURT DEPUTY:  What days does he have his

13    treatments?

14          THE COURT:  Mr. Bethea, what days do you get your

15    dialysis treatment, what days of the week?

16          THE DEFENDANT:  Monday, Wednesday and Friday, Your

17    Honor.

18          THE COURT:  All right.  So can we make arrangements

19    to pick him up on a Monday as soon as he finishes his Monday

20    treatment?

21          MR. WOLFE:  We will work the transportation around

22    his dialysis.

23          THE DEFENDANT:  I mean, I'm sorry.

24          MR. WOLFE:  He was doing it Tuesday, Thursday,

25    Saturday.

1          THE DEFENDANT:  Tuesday, Thursday, and Saturday.

2    I'm sorry.  That was my --

3          MR. WOLFE:  That's why we were bringing him here on

4    a Monday.

5          THE COURT:  Let's just go back to that.  We will

6    send out notice about a month down the road to reschedule the

7    hearing with Mr. Bethea present.

8          All right.  Well, I'm sorry that we had to get

9    everybody here and, Mr. Mackenzie, you had to drive down from

10   Greenville, but we will reschedule it.

11         MR. WITHERSPOON:  It looked like Mr. Bethea was

12   raising his hands.

13         THE COURT:  Mr. Bethea, do you want to say something

14   else?

15         THE DEFENDANT:  Yeah.  I didn't mean to say it that

16   way.  I was just letting you know what had happened.  But I

17   did want the video, Your Honor.  I didn't mean to put that on

18   the record.  I was just telling you what happened.

19         THE COURT:  Let's take a recess and let Mr.

20   Mackenzie talk with his client.  And, Mr. Mackenzie, he seems

21   to be wanting to back peddle now from what he told me

22   earlier.  I heard him tell me earlier he was consenting to

23   this video because he couldn't get dialysis treatment.  And

24   on that record, I don't think I could go forward, because he

25   can get dialysis treatment.  And the rule of criminal

1    procedure applicable here says he's supposed to be here.  So

2    let's clear the courtroom and --

3            THE COURT DEPUTY:  He's got means to talk to him.

4            THE COURT:  We will take a recess and just tell me

5    when you are ready to resume.  And I will let you discuss

6    both ways with him and decide what he wants to do.

7            (Whereupon, recess transpired.)

8            THE COURT:  Let's go back on the record in the case

9    of United States of America v. Bethea.

10           Mr. Mackenzie, what is your client's position at

11   this time?

12           MR. MACKENZIE:  Judge Anderson, during the recess, I

13   talked with Mr. Bethea again about his rights concerning

14   presence at resentencing.  And he is now prepared to say --

15   what he tells me, what he meant to say is that he understands

16   that dialysis is available today if he were here.  It will be

17   available in the future if this case needs to be rescheduled.

18   But that under any circumstances, he wishes to waive his

19   right to be personally present and wants to do this by video.

20           And let me just further reiterate, this was all his

21   idea.  This notion of doing this sentencing by video was

22   broached by Mr. Bethea.  He brought it up.

23           THE COURT:  Right.

24           MR. MACKENZIE:  That's when I contacted the Court.

25   And y'all put it in motion.  I have discussed this with him

1    more than once, Your Honor.  He signed the written waiver.  I

2    think he understands that dialysis will, in fact -- I believe

3    he's prepared to state that he understands that dialysis is

4    available today.  It will be available in the future.  But

5    that, nevertheless, he wishes to waive his right to be

6    personally present.

7            THE COURT:  All right.  Mr. Bethea, can you hear me?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  All right.  Mr. Bethea, I just want to

10   make a very clear record here.  Mr. Mackenzie, your attorney,

11   told me that we made arrangements to have you transported

12   here.  The plane ticket had been purchased.  Arrangements had

13   been made to pick you up at your facility and bring you here

14   as expeditiously as possible.  And some time mid-week last

15   week, you contacted Mr. Mackenzie and requested you be

16   allowed to participate by satellite communication; is that

17   correct?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  All right.  And I want to be very clear

20   now.  If we were to bring you here, we would, in fact, have

21   dialysis treatment available for you as needed at a very

22   reputable medical facility.  I want to be sure you understand

23   that factual statement.  Are we clear?

24           THE DEFENDANT:  Yes, Your Honor.  Yes, Your Honor.

25           THE COURT:  Knowing that, Mr. Mackenzie says you

1   still would like to go forward this morning with a satellite

2   conference as we have set up, waiving your right to be

3   personally present at the hearing; is that correct?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  All right.  And you discussed the pros

6   and cons of doing this with Mr. Mackenzie, have you?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  Is it your decision, your personal

9   decision to stay right there at your facility where you are

10  this morning and participate by satellite at this

11  resentencing hearing?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  All right.  I would note for the record

14  that we seem to have very good quality audio and video, much

15  better than is normally the case with these type conferences.

16  Have you been able to see and hear me clearly, Mr. Bethea?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.

19          Mr. Mackenzie, do you know of any reason why we

20  should not proceed this morning?

21          MR. MACKENZIE:  No, Your Honor.

22          THE COURT:  I find that Mr. Bethea has freely and

23  voluntarily waived his right to be personally present for

24  this resentencing hearing.  His presence is normally required

25  by the Rules of Criminal Procedure.  But we have a written

1    waiver that was filed with the clerk on the 25th of this

2    month signed by both the defendant and his attorney.  That's

3    part of the record in this case.  I've conducted an extensive

4    colloquy with Mr. Bethea.  And he tells me now that after our

5    brief recess to let him confer with counsel, he now

6    understands fully that if he were to be transported here by a

7    commercial aircraft carrier, it would be about an eight-hour

8    flight and he would not miss any dialysis treatments en route

9    here or back to the facility.  And for that reason, I'm

10   prepared to go forward with the resentencing this morning.

11           All right.  As Mr. Witherspoon indicated, we are

12   here for a resentencing following a reversal and remand of

13   the Fourth Circuit of the earlier sentence imposed in this

14   case.  The earlier was a life sentence that was issued before

15   the First Step Act because the court's recent activity in

16   vacating and resentencing the defendant caused the sentence

17   to occur after the First Step Act, the provisions of that

18   statute apply, which has a significant modification of the

19   potential sentence in Mr. Bethea's case.

20           After the mandate was received from the Fourth

21   Circuit, the United States Probation Office has prepared a

22   new presentence report.  It was filed with the clerk on 21st

23   of March of this year.  Copies have been furnished to both

24   the Government and the defendant.  The addendum indicates

25   that neither side has objection to the factual findings or

1    guideline application in the revised presentence report.

2            Mr. Witherspoon, have you had enough time to read

3    over the presentence report?

4            MR. WITHERSPOON:  We have, Judge.

5            THE COURT:  Is it correct?

6            MR. WITHERSPOON:  The Government has no objections.

7            THE COURT:  Very good.  Mr. Mackenzie, have you had

8    enough time to review the presentence report and discuss it

9    carefully with Mr. Bethea?

10            MR. MACKENZIE:  Yes.

11            THE COURT:  Probation indicates that you do not have

12    any objections to this new report; is that correct?

13            MR. MACKENZIE:  Yes, sir.

14            THE COURT:  Mr. Bethea, let me speak to you, sir.

15    Have you had enough time to read over this revised

16    presentence report prepared by the probation office and

17    discuss it thoroughly with your attorney?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  You just heard Mr. Mackenzie tell me

20    that you do not have any objection to the factual matters or

21    guidelines calculations contained in this revised presentence

22    report.  Is that a correct statement?

23            THE DEFENDANT:  Yes, Your Honor.

24            THE COURT:  Very good.  I will adopt the new

25    presentence report filed with the clerk on the 21st of this

1    month.

2          THE COURT DEPUTY:  On the 21st?

3          THE COURT:  I'm sorry.  March the 11th.  Thank you,

4    Ms. Floyd.  Filed on the 11th of this month.  Just for the

5    record, it's dated March the 11th, 2021.  I will adopt this

6    without objection as the Court's findings for the purpose of

7    sentencing in this case.  That means that we are looking at

8    the following statutory and guideline provisions upon

9    resentencing.  Under the statute, there's a mandatory minimum

10   of ten years and a potential maximum of life.

11         Under the statute, supervised release is at least

12   five years.  Probation is not provided for.  The fine could

13   be up to $10 million.  And the special assessment is $100.

14   Under the advisory guideline provisions, the total offense

15   level is 32.  The Criminal History Category is III.  The

16   defendant is not eligible for straight probation under Zone D

17   of the guideline table.  The advisory sentencing range is 151

18   to 180 months incarceration.

19         THE CLERK:  188.

20         THE COURT:  I'm sorry.  Thank you.  151 to 188

21   months of imprisonment, advisory only.  The supervised

22   release period is five years.  The fine was not calculated

23   due to inability to pay.  There's no restitution to

24   calculate.  And a special assessment is $100.

25         Have I correctly stated the guideline and statutory

1    provisions, Mr. Witherspoon?

2            MR. WITHERSPOON:  Yes, Your Honor.

3            THE COURT:  Mr. Mackenzie?

4            MR. MACKENZIE:  Yes, Your Honor.

5            THE COURT:  Mr. Witherspoon, I will be glad to hear

6    from the Government on resentencing.

7            MR. WITHERSPOON:  Judge, the Government filed a

8    motion for upward variance.  And we also filed a sentencing

9    memorandum to go along with our upward variance motion.  I

10   would state for the record that we stand by our sentencing

11   memorandum and the reasons for the upward variance.

12           THE COURT:  Now, at first you requested more of an

13   upward variance than you did in your recently filed

14   memorandum yesterday; is that correct?

15           MR. WITHERSPOON:  That's after going back and

16   reviewing it, I did reduce the amount.  Initially in my

17   initial motion for upward variance, I sought a three-level

18   upward variance to Criminal History Category III, offense

19   level 35, which gave a range of 210 to 262 months.

20           Yesterday, Judge, I filed a sentencing memorandum

21   where I was only seeking a one-level increase, one Criminal

22   History Category level from a 3 to a 4.  Same offense level,

23   which gives it a range of 168 to 210 months.

24           And, Judge, I can go through the reasons, however

25   the Court wants to proceed.

1          THE COURT:  I read your memorandum.  Anything you

2     want to add, I would be glad to hear you.

3          MR. WITHERSPOON:  No, sir.  Judge, I think that

4     pretty much lays it out.  This is a very unusual case as the

5     Court has said.  Aside from the remand because of First Step

6     Act and all, Mr. Bethea was given an opportunity initially to

7     lessen his sentence from a mandatory life down to a 20-year

8     sentence, and then even further.  But he refused to take that

9     opportunity, Judge.  Even though he was out on bond and was

10    supposed to be working with the Government to help lessen his

11    sentence, because he was out on bond because of his being on

12    the kidney transplant list, he continued to cook crack

13    cocaine for other drug dealers after his wife and children

14    left the home.

15         His drug weights, Judge, as in the presentence

16    report, roughly was 16 kilos of cocaine and little more than

17    a half kilo of crack cocaine.  And that does not take into

18    consideration the amount of crack cocaine that he cooked from

19    February when he was arrested until August when he was

20    sentenced, which I calculated roughly more than two kilos of

21    crack cocaine that was cooked by Mr. Bethea.  Even knowing he

22    was facing a mandatory life sentence, he continued to violate

23    the law.

24         When you look at the elements of 3553(a), I think --

25    I represent, Judge, that that -- his guidelines, the elements

1    of the 3553(a) reflect that it should be a higher sentence

2    based upon the nature and circumstances of the offense and

3    the characteristics of Mr. Bethea, the need for the sentence

4    imposed and the seriousness of the law.  He knew he was

5    facing a life sentence, but he continued to violate the law

6    even though he knew he was facing this life sentence.  And

7    the Government was taking every step possible to help him to

8    remain on the kidney transplant list, to get a kidney, and to

9    help himself so he wouldn't face this sentence.

10          Neither the guidelines nor his criminal history took

11   into account this action.  For those reasons, Judge, we ask

12   that you increase his -- the Criminal History Category from

13   III to IV.

14          In addition, Judge, in the alternative, as I stated

15   in my memo, he did not get two criminal history category

16   points for one of the convictions he had, because he had

17   committed one offense in April.  He committed another offense

18   in May.  They were consolidated for sentencing on the same

19   day.  And under the guidelines, they only count as one

20   sentence.

21          As I cited in my memo, there's case law that

22   indicates that does not accurately reflect his criminal

23   history category.  So I would ask the Court to move from a

24   criminal history category of III to a criminal history

25   category of IV and still sentence him at level 32, which is

1    the new guideline range.

2         I note in Mr. Mackenzie's memo, sentencing

3    memorandum, he says that that is not allowed because the loss

4    of the three levels acceptance of responsibility takes into

5    account for that.  But in the *Bolton* case that I cited in my

6    memo directly on point, indicates even if he lost acceptance

7    of responsibility, the Court still can enhance him for

8    committing an offense while he's out on bond for that

9    criminal activity.  I think the *Bolton* case is directly on

10   point on that issue.

11        And I think the *Hines* case is directly on point on

12   the issue of the two convictions happening on different days,

13   sentencing on the same day, not receiving criminal history

14   category points, again, is directly on point.

15        THE COURT:  You've got case authority for both of

16   your points that you argue?

17        MR. WITHERSPOON:  Yes, sir.

18        THE COURT:  Let me ask you this, Mr. Witherspoon.

19   As you know, this is a preliminary resentencing.  And the

20   Fourth Circuit in recent years has been particularly

21   interested in the defendant's behavior while incarcerated.

22   And there's one case -- I don't know the name of it.  I can't

23   remember it.

24        MR. WITHERSPOON:  It was McDonald, I think it was.

25        THE COURT:  One case where Justice Gregory said this

1    defendant thought he was in prison for life.  He had no idea

2    that a retroactive application of the sentencing laws would

3    come into play.  And notwithstanding that, he still was -- he

4    behaved himself.  He did not, you know, antagonize the guards

5    every day of the week, so to speak.  And so here we do have a

6    defendant who was -- thought he was in jail for life, and he

7    has a pretty good record.  He only has two relatively minor

8    violations, one for inappropriate use of a -- inappropriate

9    e-mail, for which he lost e-mail privileges for 30 days, and

10   inappropriate use of another inmate's cell phone, for which

11   he was disciplined mildly.  I didn't think any inmates had

12   cell phones.  How could he use another inmate's cell phone.

13        MR. WITHERSPOON:  It's not inmate's cell phone.

14   It's inmate number.  The way I understand the prison system

15   is, I am given a specific number that I can use on the phones

16   to make calls.  Therefore, whenever my number is used, it can

17   reflect it's being used by William Witherspoon.

18        THE COURT:  Inappropriate use of another inmate's

19   number, not cell phone?

20        MR. WITHERSPOON:   Yes, Your Honor.

21        THE COURT:  Both of those are relatively minor.

22        MR. WITHERSPOON:  The difference is in that case, as

23   I remember it, is that defendant had been incarcerated for a

24   long period of time before the change.  Here, it looks like

25   Mr. Bethea has only been incarcerated for five years, maybe

1    five years.

2            THE COURT:  Right.

3            MR. WITHERSPOON:  And a lot of that has been while

4    we've been going through the appellate decision about the FSA

5    and the need for --

6            THE COURT:  That's a good point.  He had been in

7    prison for last five years, and there have been a lot of

8    activity, a lot of new law coming down on sentencing.  So I

9    guess the argument I was making earlier is, has a little bit

10   less force because of that.

11           MR. WITHERSPOON:  I think if you look, Judge, he

12   has -- when you go through again the elements of the 3553(a)

13   as far as helping vocational and educational training, he did

14   not have a GED.  And as a result of going through the Bureau

15   of Prisons, he's working toward getting his GED, which is

16   another element that the Court takes into consideration in

17   3553(a) factors.  There is hope that he will someday, some

18   point get a kidney transplant which will alleviate dialysis,

19   which will allow him to work.  In his memo he even says now

20   he's working in the Bureau of Prisons.  So he could get

21   vocational training that would help him when he's released

22   from prison, which would then allow him to help support his

23   family.

24           He's no longer looking at the life sentence.  His

25   guidelines are substantially less today than they were in

1    2014, 2015.  And so I think you take all that into

2    consideration.  I think that's when you weigh those and when

3    you look at those, I still think, Judge, that the 168 to 210

4    months is sufficient but not greater than necessary.

5            THE COURT:  All right.  Mr. Mackenzie, I will be

6    glad to hear from you.

7            MR. MACKENZIE:  Thank you, Judge Anderson.  I just

8    want to reiterate about Mr. Bethea's medical condition.  It's

9    well documented in the presentence report, but he does suffer

10   from lupus, kidney disease, end-stage renal failure, high

11   blood pressure, among other elements.

12           Lupus is immunocompromised condition, which makes

13   him more susceptible to other conditions.  He's in need of a

14   kidney transplant.  He does dialysis three days a week.  He

15   has a fistula in his arm that makes that easier to do.  He's

16   on multiple medications.

17           He does have a prior record, Your Honor.  His prior

18   convictions no longer qualify for an 851 enhancement under

19   the First Step Act.

20           I also noted in my sentencing memorandum that he was

21   never considered a career offender under the sentencing

22   guidelines even at his initial sentencing.  And the reason I

23   raise that is, it just seems a little inconsistent to me that

24   here we have a man who was serving a mandatory life

25   sentencing and wasn't even considered a career offender under

1    the guidelines.  In spite of his prior record, he does not

2    have any convictions for a crime of violence or use of force

3    or anything like that.

4          He has done well in prison.  His disciplinary record

5    is attached to my sentencing memo.  It's one page.  I don't

6    know that I've ever seen one that short.  It lists only one

7    incident where he improperly used a telephone to call his

8    wife.  And he was sanctioned for that.  He tells me, although

9    we don't have a record of it, there was another recent

10   incident where he sent an improper e-mail.  I believe it was

11   to another inmate.  And he was sanctioned for that.  And

12   those are his only disciplinary violations.  He's

13   participated in multiple education courses.  Your Honor,

14   those records are attached to his compassionate release

15   petition.  That's in the record.  He's taking multiple

16   education courses to better his education and improve

17   himself.

18         And, yes, I understand your point that even though

19   he was facing a life sentence, he took advantage of these

20   opportunities.  I would say that's still relevant.  He

21   certainly didn't do badly while he was in prison.

22         I understand the upward variances that are requested

23   by the Government.  The first one having to do with the

24   continued criminal activity after he was on bond, after his

25   guilty plea before his initial sentencing.  At the initial

1    sentencing, he lost his acceptance points at Your Honor's

2    direction because of his continued criminal activity.  And

3    that result -- that results -- first of all, his initial

4    guideline range was 108 to 135 months.  With the loss of

5    acceptance points, his range is 151 to 188 months.  That's

6    his present guideline range.  That is a difference of at

7    least 43 months, at least.  In other words, that's a

8    difference of at least three and a half years.

9            If Your Honor sentences him under the guidelines, he

10   is already going to serve an additional three and a half

11   years because of that continued criminal activity.  And I

12   would respectfully take the position that may be enough to

13   address that activity.

14           THE COURT:  Well, I don't want to argue with you,

15   but we have a lot of defendants who lose the credit for

16   acceptance of responsibility because they tested positive for

17   drugs or shoplifting or something.  But he had pretty bad

18   conduct, pretty bad conduct involved here.

19           MR. MACKENZIE:  But I would respectfully say, he's

20   not escaping punishment.  He's facing an additional three and

21   a half years at least under the guidelines.  I understand the

22   *Bolton* case.  I've read the *Bolton* case that's cited by the

23   Government.  This is a serious case.  I am not trying to

24   downplay it.  But this *Bolton* case is a far more serious case

25   than what's going on here.  In that case there was

1    allegations of unlawful possession of firearms, stolen

2    firearms, 924(c) convictions.  That was a little bit

3    different than what's going on here.

4            I understand the Government's position, their motion

5    for variance based on his criminal history category.  His

6    criminal history category is not understated.  The

7    guidelines, you know, two of his prior sentences were

8    consolidated under the guidelines because that's the rule.

9    That's what the guidelines say you are supposed to do.  That

10   is routine.  That is uniform in every case where the issue

11   comes up, the guidelines say that's what you do.  In every

12   case for every defendant in every presentence report, in

13   every federal district in this country that is the rule.

14   That is what you are supposed to do.  So if we are not going

15   to do that in this case, that raises a question in my mind,

16   does that create a sentencing disparity issue there?  Because

17   the guidelines say that is the norm.  And if we are not going

18   to do that in this case, is he being treated fairly like all

19   the other defendants in the country?

20           Seems to me that if the presentence report had not

21   consolidated those cases, that would be grounds for a

22   variance.  But the presentence report, the guidelines were

23   calculated correctly.  I don't know that that's a grounds for

24   an upward variance.  And I would point out that he did end up

25   serving six months for those prior convictions.  He later

1    violated his probation and ended up serving six months.  So,

2    again, I don't know that he's escaped punishment.

3           You know, Congress with the First Step Act said --

4    they clearly indicated they want to reduce the sentences for

5    people like Mr. Bethea and people who are in similar

6    positions to Mr. Bethea.  They have clearly made that -- said

7    that.  And the Fourth Circuit has confirmed that and said,

8    yes, not only that, but the First Step Act applies to this

9    case.

10          And Congress, it was Congress's intent to reduce

11   these old Draconian sentences from the 1980s and 1990s.  It

12   seems to me that a lot of these resentencing issues that are

13   coming up all seem to be addressed by the guidelines.  You

14   know, all the circumstances in this case seem to point us

15   back to the sentencing guidelines.  And that's what we are

16   asking for.  We are asking for the low end under the

17   guidelines, 151 months.  That is a sentence that's reasonable

18   and sufficient.  You know, that's 12 1/2 years.  That is not

19   a short sentence.  Again, Mr. Bethea is not in any way

20   escaping punishment.

21          And I'm also glad to address the compassionate

22   release issue when you are ready.

23          THE COURT:  I think we should take that up second

24   after we impose the resentence.

25          MR. MACKENZIE:  Yes, sir.

1          THE COURT:  I think I earlier declined a request to

2     appoint counsel, but I'm going to appoint counsel today to --

3          MR. MACKENZIE:   I'm glad to address that.

4          THE COURT:  Representing him on that second phase of

5     that proceeding.  All right.

6          MR. MACKENZIE:  Yes, sir.

7          THE COURT:  Anything further?

8          MR. MACKENZIE:  No, sir, Your Honor.

9          THE COURT:  Mr. Bethea, can you hear me, sir?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  You have a right to make any

12     statement that you wish at this time before the Court decides

13     upon a sentence in your case.  So this is your chance to

14     speak.  I will be glad to hear anything you want to say.

15          THE DEFENDANT:  Yes, Your Honor.  I have a letter I

16     want to read, if that's okay.

17          THE COURT:  Yes, sir.  Now, read slowly.  The court

18     reporter has to take down what you say.  And frequently when

19     people read something, they speed up and talk fast.  And it's

20     hard on the court reporter.  So please read slowly.

21          THE DEFENDANT:  Your Honor, also, in case they miss,

22     I know my lawyer has a copy as well.

23          THE COURT:  All right.  Very good.  We will give a

24     copy to the court reporter then.  That's good.  Go ahead.

25          THE DEFENDANT:  All right.  Honorable Judge Anderson

1    Jr, it is a privilege and an honor to have an opportunity to

2    share these words with you in the court.  The years of

3    incarceration I have experienced have actually been some form

4    of blessing in my life.  I don't mean to infer that I am

5    enjoying prison or the time spent away from my family and

6    those I love isn't hard.  I just want to demonstrate that

7    this time has been beneficial in bringing about change in my

8    attitudes and my actions.  I know this is a common refrain

9    among those seeking leniency from the Court, but please allow

10   me a few moments to express how I'm not using cliches for

11   speaking on the reality of change that has occurred in my

12   heart and life.

13          Judge Anderson, my past is littered with a series of

14   unfortunate incidents and poor decisions which led me to my

15   current set of circumstances.  The missteps of my past I have

16   come to understand were not based on effects in my character

17   or errors in my thinking.  Taking the drug classes I was

18   offered and living on the unit where the drug counselors and

19   facilitators have their office allowed me to assess and

20   analyze the information that has brought to my infamy and

21   change.  Your Honor, I am not a bad person.  I just made bad

22   decisions based on bad information.  This doesn't absolve me

23   of guilt or responsibility for my past criminal behavior.  I

24   accept both.  But it does explain the difficulty I have

25   experienced in the past in trying to change.  That difficulty

has been removed.  The clarity I have gained through the hard

work of brutal self-analysis and introspection is a cherished

possession.

In addition, the institutional program coupled with

the substance abuse prevention classes I have completed and

created a reservoir of knowledge I can draw from to my God of

critical thinking and decision-making process.  No longer do

I allow the misstep or misleading to cloud the truth and

corrupt my decision-making.  I can see the obstacle in my

path.  And more importantly, I can visualize the proper steps

to take to maneuver around those so-called obstacles and

continue on the proper path.  This is not a jailhouse change

but a life-altering understanding that will assure not just

the end of my criminal thinking and behavior, but also allow

me to be a constructive member of my community, a responsible

member of my family, and a loving father to my children, and

a loving husband to my wife.

No one has the power to change the past, but all

humans possess the capacity to change within themselves.  I

have often heard it said, when you know better, you do

better.  Well, Your Honor, I can honestly say I now know

better.  I owe it to my family to do better.  I owe it to my

children to do better.  I owe it to my wife who has been by

my side throughout this incarceration to do better.  Most

importantly, I owe it to myself to do so and be better.  I

1    owe it to myself to come out of the delusions of drug dealing

2    and criminal lifestyle and become the man I was meant to be,

3    a man of honor, dignity, respect and value.

4         I had begun the process while still within these

5    walls even though Springfield allows me to remain medically

6    unassigned to a job placement due to my medical condition,

7    need for dialysis.  I've had chosen to maintain work detail

8    and manifest the process of change in my actions and not just

9    my record.  It is my sincere intention to redeem myself by

10    living as an agent of responsibility, maturity and growth

11    where once I lived an an agent of pain, suffering and

12    destruction.  I'm doing -- I am doing and will continue to do

13    everything in my new-found understanding and power to

14    continue to affect change in my life.

15         I am appealing to this Court for another opportunity

16    at freedom.  I don't claim to have earned another chance.  I

17    just claim to be worth one.  I accept that criminal conduct

18    must be punished.  But the greater system of justice ever

19    devised by man always sought to define the demands for

20    misdeeds to be punished with a devine attributes of mercy.

21         I believe both aspects of justice can be satisfied

22    in my situation with a grant of compassionate release.

23    Unprecedented times call for unprecedented actions.  COVID-19

24    is a daily reality currently at Springfield, Missouri,

25    especially for dialysis patients.  Congress has empowered you

1    to tip the justice with compassion in these types of

2    circumstances.  I thank you, Judge Anderson, and the Court

3    for your time and your thoughtful consideration.

4            THE COURT:  All right.  Thank you, sir.  Mr.

5    Mackenzie, anything further?  You have a written copy?  If

6    you could give it to the court reporter, I would appreciate

7    it.

8            MR. WITHERSPOON:  Your Honor, for the record, I

9    think that was document entry level 101-3, was the letter.

10           THE COURT:  It's already in the record.

11           MR. WITHERSPOON:  That was sent with his

12   compassionate release.

13           THE COURT:  Right.  Anything in reply by the

14   Government?

15           MR. WITHERSPOON:  Yes, sir, Judge.  Mr. Mackenzie

16   and Mr. Bethea tend to highlight his medical conditions of

17   lupus, kidney disease, with the fistula and the medical --

18   multiple medications that he's received.  I would point out

19   to the Court, he had those same conditions when he was

20   selling drugs.  They did not preclude him from being involved

21   in the drug dealing, cooking crack cocaine.  And what gets

22   me, I guess, is he was doing it in his family's house.

23   Because he was on home detention, he couldn't leave.  He

24   would wait until his wife and children leave the house, bring

25   in drug dealers into his family's home, and cook crack

1    cocaine.

2         He was never a career offender, but he was serving a

3    life sentence.  And he's not the only person that that has

4    happened to prior to the First Step Act where possession of

5    crack cocaine, PWID crack cocaine was pled down to

6    possession, which would preclude a person from being a career

7    offender, but would still be considered as a felony drug

8    offense, which could cause the Court to sentence a life

9    sentence.

10        Mr. Bethea's sentence, the request I ask, is a

11   40-month sentence, increase of 40 months.  Mr. Mackenzie says

12   that was a -- three and a half years was what the *Bolton* case

13   says.  So we are in the same boat with the criminal activity

14   while out on bond, no acceptance of responsibility.  It's the

15   same amount that we are seeking.

16        The sentencing guidelines, Judge, as the Court has

17   said, is not the sentence.  The Court -- this Court has to

18   determine that the guidelines are applicable, that they are

19   appropriate, that they are correct.  And then the Court can

20   make the decision where the sentencing goes.  The Court can

21   go up or the Court can go down.  You just have to start at

22   the sentencing guidelines.  And for Mr. Mackenzie to say that

23   the sentencing guidelines is where you are stuck at is not

24   true.  We have defendants come in all the time asking this

25   Court for downward departures or downward variances for one

1    reason or another.  Under Mr. Mackenzie's position, you

2    wouldn't be able to do that.  But the Fourth Circuit and the

3    Supreme Court and Congress have given the Court the

4    discretion, starting at the guidelines, to make that

5    determination where it should be sentenced.

6              And we are not saying that he's escaping punishment.

7    We are not saying that.  We are just saying that, Judge, the

8    punishment in this case should be higher than what the

9    guidelines are in this case.

10             Mr. Bethea talks about a substance abuse.  But when

11   you look in the presentence report, paragraph 93, Mr. Bethea

12   talks about substance abuse.  When you look in the

13   presentence report, page 28, paragraph 93, he wasn't an

14   abuser of drugs.  He was just selling drugs for cash.

15             He also in that same paragraph went to LRADAC, which

16   as the Court knows is a drug treatment organization here.  So

17   he's had drug treatment.  Even after that, he continued to

18   sell drugs in this case for a number of years.

19             We again, Judge, think his guidelines under the

20   factors of 3553(a) that we've cited in our sentencing

21   memorandum and/or an alternative because his guidelines under

22   represent his criminal activity, that the one-level increase

23   to 168 to 210 months is a reasonable sentence in this area.

24             And I will point out to the Court, his guidelines

25   now of 151 to 188, the 168 to 210 primarily encompasses that

1    same guideline level.

2          THE COURT:  Some overlap there.

3          MR. WITHERSPOON:  Tremendous overlap there.  So,

4    again, we would ask the Court for upward variance.

5          THE COURT:  All right.  Mr. Witherspoon, you've done

6    your usual good job of forcibly advocating the Government's

7    position here.  The defendant probably deserves an upward

8    variance, but I'm going to respectfully disagree in this case

9    and sentence within the guidelines.  But I am going to

10   sentence at the very high end of the guideline level.

11         Having calculated and considered the advisory

12   sentencing guidelines and having also considered the relevant

13   statutory sentencing factors of Section 3553(a) of Title 18,

14   it is the judgment of the Court that the defendant,

15   Rayco Bethea, is hereby committed to the custody of the

16   Bureau of Prisons to be imprisoned for a term of 188 months,

17   which is the top of the applicable guideline range.

18         I find the defendant does not have the ability to

19   pay a fine, therefore, the fine is waived.  I previously

20   imposed a mandatory special assessment of $100.  Probation

21   informs me that had been paid in full.  Upon his release from

22   incarceration, the defendant shall be placed on supervised

23   release for a term of five years.  Within 72 hours of his

24   release from custody of the Bureau of Prisons, the defendant

25   shall report in person to the probation office in the

1    district to which he is released.

2          While on supervised release, the defendant shall

3    comply with the mandatory and standard conditions of

4    supervision that are all set out in Title 18 of the United

5    States Code, Section 3583(d), and the sentencing guidelines

6    special conditions of supervised release.

7          I'm required to put my reasons on the record.

8    Special conditions of supervised release 1 through 9 and 13

9    serve the statutory sentencing purposes of public protection

10   and rehabilitation pursuant to Section 3553(a)(2)(C) and (D).

11         Standard conditions of supervisions 10 and 12 serve

12   the statutory sentencing purpose of public protection

13   pursuant to Section 3553(a)(2)(C) of Title 18.

14         Standard condition of supervision 11 ensures that

15   the defendant does not engage in activities that may

16   potentially conflict with the other conditions of supervision

17   and that may pose risk to the defendant's probation officer.

18         Now, there's a recent decision in the Fourth Circuit

19   that says I can't incorporate by reference the standard

20   conditions.  And usually we have from the probation office

21   the reference to the specific guidelines that sets out those

22   standard conditions.  And I don't see it here.  Can you help

23   me with that?

24         PROBATION OFFICER:  Your Honor, I believe what you

25   are referencing to is the conditions that you just read over

1    to go through conditions 1 through 13.

2          THE COURT:  1 through 13.

3          PROBATION OFFICER:  And those are also incorporated

4    in reference within the presentence report towards the latter

5    part --

6          THE COURT:  Those special conditions are already

7    included in the presentence report and incorporated by

8    reference.  Mr. Mackenzie, you read over those special

9    conditions?

10         MR. MACKENZIE:  Yes, Your Honor.

11         THE COURT:  Has your client read those special

12   conditions?

13         MR. MACKENZIE:  Yes, sir, I reviewed it with him.

14         THE COURT:  Very good.  I put on the record my

15   reasons for imposing those special conditions.

16         In addition, the defendant shall comply with the

17   following special condition -- I'm sorry.  I've been saying

18   special.  Standard.  I misspoke.  I should have said 13

19   standard conditions.  In addition, there's one special

20   condition, the defendant must submit to substance abuse

21   testing to determine if he's used a prohibited substance.  He

22   must contribute to the cost of this program in an amount

23   determined reasonable by the probation officer's sliding

24   scale for services.  If applicable, he shall cooperate in

25   securing payment from any third-party, such as insurance or

1    Medicaid.  This special condition is based upon the

2    defendant's admitted substance abuse and history as detailed

3    in the presentence report.

4         Now, Mr. Bethea, you've signed a plea agreement

5    containing a partial waiver of your appeal rights in this

6    case.  Only in very narrow circumstance may a defendant who

7    has waived his appeal in this fashion nevertheless attempt to

8    pursue an appeal.  You should discuss with Mr. Mackenzie in

9    detail whether you have any grounds for an appeal and whether

10   an appeal would be in your best interest or not.

11        If you wish to appeal and cannot afford an attorney,

12   the court would appoint one for you.  If you wish to appeal,

13   you would have to file your notice of appeal within 14 days

14   from the day the judgment order containing your sentence is

15   filed with the clerk.

16        I'm required to put on the record my reasons for

17   imposing this particular sentence.  First of all, as required

18   by Section 3553(a), I have considered the nature and

19   circumstances of the offense.  In this case, we have a

20   defendant who has pled guilty to conspiracy to possess with

21   intent to distribute 5 kilograms or more of a mixture of

22   substance containing cocaine and 280 grams or more of a

23   mixture or substance containing cocaine base.

24        This conviction arose from an investigation of the

25   so-called "Antonio Williams drug distribution ring," also

 1    known by the nickname Dollar Bill.  The investigation began

 2    in April 2011 with the interception of wire and electronic

 3    communications on cellular telephones used by Mr. Williams.

 4    That wiretap information revealed that Williams was a

 5    multi-kilogram cocaine dealer in the Batesburg-Leesville area

 6    of South Carolina who was supplying a large number of

 7    conspirators with cocaine, including the defendant in this

 8    case, Mr. Bethea.

 9          Subsequent to Mr. Williams's arrest, he was

10    interviewed and provided historical information regarding Mr.

11    Bethea's illegal drug activity.  Another defendant, William

12    Holloway, also provided information regarding Mr. Bethea's

13    drug activity.

14          As indicated by Mr. Witherspoon, he was ultimately

15    held responsible for 16 kilograms of cocaine and one-half of

16    a kilogram of crack cocaine.  Both of those are serious

17    offenses in this Court's opinion.

18          Historically in the District of South Carolina, we

19    are in the top five districts in the country in terms of

20    crack cocaine prosecutions.  So suffice it to say that crack

21    cocaine distribution is a serious and pervasive crime in

22    South Carolina.  A lot of people become addicted to this

23    substance because of people like Mr. Bethea who are providing

24    it to them.

25          Regarding the history and characteristics of the

1    defendant, Mr. Bethea has a criminal history, which we might

2    consider to be moderate.  It's in the mid-point, so to speak.

3    It includes prior convictions for forgery, burglary,

4    third-degree grand larceny, possession of crack cocaine,

5    possession with intent to distribute crack cocaine, first

6    offense, possession of crack cocaine, first offense, and then

7    some traffic violations involving failure to stop for blue

8    lights and a driver's license restriction.  He also has many

9    convictions for minor traffic offenses that don't bear

10   mention here.

11           I do note, as the Government, I believe, points out,

12   in spite of these convictions in the past for serious

13   convictions, Mr. Bethea spent very little time of

14   incarceration.  He was given suspended sentences with

15   probation.  And in one of the situations, violated probation,

16   and then only received a sentence of six months, which was

17   combined with another conviction at the same time.

18           I'm aware of his medical problems.  His history of

19   lupus and kidney problems is well-documented in the record.

20   He also has high blood pressure, acid reflux, a 14 percent

21   kidney function.  He's had Stage IV -- I'm sorry, Stage V

22   renal failure.  And he has a permanent fistula implanted to

23   assist with the dialysis treatment.  He also has related

24   conditions that kind of spinoff from his kidney problems of

25   sleep disturbance, fatigue, heartburn, inability to exercise,

1    sun sensitivity, jaundice, and some type of problem with his

2    left arm, and dietary restrictions.  He also has heartburn.

3    I'm aware of all those medical conditions.

4            Probation indicates in their presentence report that

5    according to the Bureau of Prisons, however, his lupus is now

6    in remission on medication.  His hypertension is in

7    remission, not requiring medication.  He was diagnosed with

8    sleep apnea that was resolved with a foam to elevate the head

9    of his bed.  And probation indicates that the records at the

10   institution indicate he has no other medical issues at this

11   time.

12           He does not require assistance completing his daily

13   living skills.  But he does have a serious kidney problem and

14   he is on the list to get a kidney transplant because of that

15   problem.

16           I would, of course, also note, as Mr. Witherspoon

17   has appointed out, he had these medical problems when he

18   committed the crimes at issue here.  According to his record,

19   he went on social security disability in the year 2011 and

20   has not had gainful employment since that date.  The

21   indictment here alleges that the crime, the conspiracy, went

22   from 2002 to 2014.  But if you dig deeper into the

23   presentence report, Mr. Bethea's involvement began in 2011

24   and went on to 2013.  So he committed this drug trafficking

25   crime while on disability and while he still had this kidney

1    problem that still plagues him today.  And so I'm aware of

2    his medical problems.

3         Regarding his behavior in prison while incarcerated,

4    as we've already said, he only has two minor bumps on his

5    record, one using another inmate's number to make a cell

6    phone call, and another for sending an unauthorized e-mail

7    message, which are extremely lightweight, in my opinion.

8         He's taken some educational programs, including

9    National Parenting Program I and II.  He's still working on

10   his GED.  He hasn't taken any real vocational training,

11   primarily, I'm sure, because of his kidney problems.  But Mr.

12   Mackenzie indicates that he has taken a number of educational

13   programs in an effort to get his GED, all of which is

14   commendable.

15        I've also considered as required the need for the

16   sentence imposed to reflect the seriousness of the offense.

17   As I said, this is a serious offense, particularly as Mr.

18   Witherspoon has mentioned numerous times, while the defendant

19   was given the luxury of being out on bond for these pending

20   charges for which he faced a potential life sentence, he used

21   that opportunity to continue to cook crack cocaine in his

22   home when his wife and children were not present, in clear

23   violation of the terms of his release.  He was not held

24   accountable for that weight of crack cocaine produced, but it

25   did cause him to lose the discount for acceptance of

1    responsibility which was three levels.  And that translated

2    into a good many additional months of incarceration as

3    indicated by counsel.

4         I've also considered the need for the sentence

5    imposed to promote respect for the law.  Once again, his

6    behavior while on pretrial release pending trial of cooking

7    crack cocaine certainly does not demonstrate respect for the

8    law.  I am also required to consider the need for imposing

9    just punishment and adequate deterrence and the need to

10   protect the public from future crimes of the defendant.  I've

11   carefully considered all those factors.

12        I've also considered the need to avoid unwarranted

13   disparity in the sentences of similarly situated

14   co-defendants.  Mr. Bethea's record speaks for his, his

15   conduct.  Particularly his behavior while on release pending

16   trial sets him apart from similarly situated co-defendants in

17   terms of his disregard for the law while these charges were

18   pending.

19        Those are all my reasons.  Anything further?

20        MR. WITHERSPOON:  Nothing from the Government, Your

21   Honor.

22        MR. MACKENZIE:  No, sir.

23        THE COURT:  Do you want to take a break and then go

24   into the compassionate release, or do you want to move right

25   into it?

1          MR. WITHERSPOON:  I'm ready.

2          MR. MACKENZIE:  I'm ready.

3          THE COURT:  Let's go right into it then.  I guess we

4    need to call on Mr. Mackenzie first then.  This is your

5    motion.

6          MR. MACKENZIE:  Thank you, Your Honor.  Yes, Mr.

7    Bethea filed a pro se motion for compassionate release.  I'm

8    glad to address that at this time.

9          THE COURT:  Let's just -- Mr. Bethea, do you consent

10   to proceeding with this compassionate release motion on the

11   satellite just as you did with the earlier sentencing

12   hearing?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  I'm not sure he really has a right to be

15   present for it.  He doesn't even have a right to a hearing on

16   it, but let's confirm.  You are satisfied with going forward

17   with the satellite, Mr. Mackenzie?  I'm sorry, Mr. Bethea?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Go ahead.  Let me hear from you.

20         MR. MACKENZIE:  Yes, sir, Your Honor.  He's filed a

21   motion for compassionate release alleging extraordinary and

22   compelling reasons for his release.  Under the statute, he

23   alleges he has a serious physical or medical condition such

24   that he's not able to perform self-care for himself.  And he

25   suffers from a condition from which he will not recover.

1    Again, the medical condition is pretty

2 well-established in the record.  I am not to go through that

3 again.  Your Honor seems to have a good grasp of that.  I

4 would just add that had Mr. Bethea believes that he would

5 receive better medical care if he were released.  He would

6 receive better medical care and have a better chance of a

7 kidney transplant if he's released on the outside.

8    There's also COVID-19 concerns.  Of course, we all

9 have that concern.  But according to the CDC, kidney disease

10 puts him at a higher risk --

11    THE COURT:  I think you indicated he received his

12 first vaccination when the memo was written.  Has he received

13 a second one now?

14    MR. MACKENZIE:  He has, Your Honor.  And Mr.

15 Witherspoon mentioned that in his filings.  And, yes, in the

16 meantime, he has received his second vaccination.  But,

17 nevertheless, the virus affects people in different ways.

18 And there are variants that are coming along, it seems

19 lately.  And, again, he's at higher risk because of his known

20 diseases.

21    He has a release plan.  His application for

22 compassionate relief is attached.  It's actually attached to

23 the Government's response to Mr. Bethea's petition.  Therein

24 it lays out his release plan.  He would -- he tells me now he

25 would be living with his mother-in-law here in the Columbia

1    area.  He does have a place to go and reside.  He would

2    receive medical care at the same place where he had been

3    receiving medical care here in the Columbia area before his

4    incarceration.  He will have financial support.  As has

5    already been mentioned, he qualifies and was actually

6    receiving social security at one point.  That will have to be

7    reactivated, but he does qualify for that.

8            He tells me that he also has a possible employment

9    opportunity lined up.  And I will let him address that, Your

10   Honor.

11           On the compassionate release, we also had the *McCoy*

12   decision from the Fourth Circuit, *United States v. McCoy*.

13   This is the case -- in the Fourth Circuit opinion in this

14   case, in the Bethea case, the Fourth Circuit referred us to

15   their McCoy decision from last year, and said that Mr. Bethea

16   may be eligible for compassionate release under that

17   decision.  And in that decision, the Fourth Circuit said that

18   district court can consider any extraordinary or compelling

19   reason for release, and that the Court is not constrained by

20   the policy statement contained within the sentencing

21   guidelines.

22           And the Court went on to say that if there is a

23   gross disparity between the prior sentence and what a

24   defendant would be sentenced to under present circumstances,

25   that can be a reason for compassionate release.  Congress is

1   saying that these Draconian sentences for drug cases are no

2   longer necessary, but that isn't reason for compassionate

3   relief.  And we do have that in this case where Mr. Bethea

4   was initially facing a mandatory life sentence and the

5   guideline range is now 12 1/2 to 15 years, Your Honor.

6          THE COURT:  But let me jump in here.  As Mr.

7   Witherspoon points out, you already are getting the benefit

8   of the new law --

9          MR. MACKENZIE:  Yes, Your Honor.

10          THE COURT:  -- in this case.

11          MR. MACKENZIE:  Yes, sir, Your Honor.  I was also

12   going to tell you that it is Mr. Bethea's position on the

13   compassionate release motion that he be actually released

14   from confinement.

15          THE COURT:  I understand that.  But you are saying

16   that *McCoy* says I can look at intervening changes in

17   sentencing law.  Well, we did when we took the remand from

18   the Fourth Circuit and did away with 851 enhancements.  We

19   did sentence him under the new more lenient provisions.

20   Right?

21          MR. MACKENZIE:  Yes, sir.  Now that you made that

22   ruling, that issue is pretty well resolved.

23          THE COURT:  All right.

24          MR. MACKENZIE:  Nevertheless, Mr. Bethea is

25   requesting release under the statute.  Of course, the Court

1    is required to make an individual assessment in every case.

2    And we do have some serious medical conditions in this case

3    and --

4            THE COURT:  Let's talk about the medical conditions.

5    I don't want to sound punitives here, but as I point out

6    earlier, he qualified for complete social security disability

7    back in 2011.  And then he committed these crimes after that.

8    And he committed these crimes with his kidney problem, with

9    his dialysis treatments.  And so if I would accept that

10   argument, and I don't want to make it sound superficial, but

11   it would almost be like if you have a severe medical problem,

12   you have a get-out-of-jail-free card in your pocket.  Because

13   you commit a crime, a serious crime, get a sentence and then

14   turn right around and want to come back out because you've

15   got this medical problem that you had well before you started

16   committing the criminal conduct.  I'm just bothered by that.

17           MR. MACKENZIE:  I acknowledge that, Your Honor.  I

18   would just add to that that with the passage of time and

19   increase in age, you know, the lupus is not going to go away.

20   These are chronic conditions.  The kidney disease is not

21   going to go away.  And with his increasing age, you know,

22   this is going to be more and more of a problem for him over

23   time and --

24           THE COURT:  Well, again, just to follow up on that,

25   I'm supposed to avoid the unwarranted disparity in sentencing

1    of similarly situated co-defendants, his co-defendants who

2    did not have severe medical conditions had sentencing they

3    cannot get out from under for medical reasons.  That's

4    another matter I need to consider.

5          MR. MACKENZIE:  I would also point out that with the

6    COVID-19 concerns, he is more susceptible if he is to

7    contract further disease or be in serious trouble with the

8    COVID-19 itself.  So he's asking that he be released at this

9    time under the compassionate release statute, Your Honor,

10   released to supervised release and home detention.

11         I believe Mr. Bethea would also like to address the

12   Court on this issue at the appropriate time, Your Honor.

13         THE COURT:  I will hear from him.  Mr. Bethea you

14   have a right to make any statement you wish on this motion

15   for compassionate release.  I will be glad to hear anything

16   you want to tell me.

17         THE DEFENDANT:  Yes, Your Honor.  I just want to

18   read this.  Your Honor, I'm here today to ask for mercy on

19   two things.  One, if you can go as low as 120 months; two,

20   Your Honor, if you can grant me compassionate release, the

21   rest of my time on home confinement with probation.  If you

22   grant me compassionate release, I have a job offer at UPS.

23         And with that being said, if I'm released, Your

24   Honor, once I start my dialysis treatment on the street, if

25   I'm released, they will put me on the kidney transplant list

1    as soon as possible.  I also have family members that might

2    have a kidney match.

3              Your Honor, the guy you sentenced in 2015 is not the

4    same guy that's sitting here today.  Your Honor, all I ask is

5    for a second chance to be with my wife and children.  All I

6    want to do is to work and help my wife to take care of our

7    children.

8              Since my incarceration, I have put my wife and

9    children through a lot by not being present.  My children are

10   growing up real fast.  And all I can ask is to be with my

11   children's lives (sic), especially my boys.  I just want to

12   make sure they don't go down the same path as I did.

13             Your Honor, this has been a learning experience and

14   a wake-up call.  All I ask is for a second chance to be with

15   my wife and children.  I know my wife and children need me as

16   much as I need them.

17             And, again, I'm just asking for your mercy so I

18   could be with my family again.  That's it.

19             THE COURT:  All right.  Thank you, sir.  Anything

20   further, Mr. Mackenzie?

21             MR. MACKENZIE:  No, Your Honor.

22             THE COURT:  Mr. Witherspoon?

23             MR. WITHERSPOON:  Judge, it sounds like, as I stated

24   in my memo, his two reasons are COVID-19 and FSA.  I think as

25   the Court eluded to, the First Step Act, he was sentenced

1    today as if he was brought in for the first time today.  So I

2    think that one is aside.  And that has been resolved, as the

3    Court has said.

4         Other reason is COVID-19.  He contends that because

5    of his medical conditions he's more susceptible to COVID-19.

6    As I pointed out in one of my responses, he was exposed to a

7    person who had COVID-19.  He was isolated, quarantined, and

8    showed no signs.  Thereafter, now he has been inoculated with

9    both vaccines for COVID-19.  That does not say that he won't

10   get it.  But according to all the data, as a result of his

11   inoculations, he's more than 90 percent -- I wouldn't say

12   cured.  The vaccines are 90 percent good to prevent any

13   serious harmful effects from COVID-19.  Even though he was

14   exposed, he did not have the inoculation, now he has the

15   inoculation, and the inoculation are helpful in that regard.

16        I would point out a couple of things that seem a

17   little odd here.  He said that he was going to apply for

18   social security disability.  Both he and Mr. Mackenzie says

19   that he has an employment opportunity.  He clearly said that

20   he has a job opportunity with UPS.  That's not light work.

21   If he's disabled, how in the world is he going to be able to

22   work at UPS?

23        THE COURT:  Well, you can get a job and give up your

24   disability benefits.

25        MR. WITHERSPOON:  He says he's disabled.

1          THE COURT:  Right.  Right.

2          MR. WITHERSPOON:  And he's going to apply for social

3    security.  So you can't be disabled today and then tomorrow

4    get a job saying I'm no longer disabled.  There's got to be

5    something there.

6          He wants home confinement, Judge.  We gave him home

7    confinement or detention between his guilty plea and his

8    sentencing.  But he, nevertheless, continued involvement in

9    his drug dealing.

10         And he's put his family through a lot, and he

11   certainly has.  But his family never was in his consideration

12   during the time he was out on bond.

13         When you look at his grounds for compassionate

14   release, he doesn't like being in prison.  He doesn't like

15   being away from his family.  But those were not sufficient to

16   prevent him from continuing in his drug dealing during the

17   time of his bond.

18         Judge, I would contend that given all the weight,

19   all the considerations that you've heard today, that he has

20   not shown grounds sufficient for compassionate release such

21   that he would be released to home detention from prison.  So

22   we ask that you deny his motion.

23         THE COURT:  Anything in reply?

24         MR. MACKENZIE:  I don't have anything else, Your

25   Honor.  Thank you.

1          THE COURT:  Give me one second.  All right.  On the

2     record before me, I'm constrained to deny the motion for

3     compassionate release.  First of all, as Mr. Witherspoon

4     pointed out, pursuant to the *McCoy* case, the defendant has

5     already been given the benefit of the new sentencing laws

6     that have gone on the books since his original sentence.  And

7     he was sentenced under the First Step Act and the 851

8     enhancements went away.  And that substantially reduced his

9     sentencing exposure from a life sentence down to just over 16

10    years, I think 16 1/2 years, approximately, at the high end

11    of the guidelines.

12          I'm aware of the terrible problems in the prisons

13    occasioned by the COVID-19 pandemic, but Mr. Witherspoon in

14    his memorandum has documented all of the corrective measures

15    that the bureau has taken to provide for safety and security

16    there during the pandemic.  When the defendant was exposed to

17    someone who tested positive, he was given -- he was taken

18    away, and thankfully did not suffer from that.  He's now

19    received both vaccines which are supposed to be at least 90

20    percent effective for preventing the disease.

21          I'm certainly aware that his lupus problems and

22    kidney problems make him much more susceptible to bad results

23    while in prison.  I'm fully aware of that.  But I cannot get

24    away from the fact that his behavior while on pretrial

25    release pending trial in this case, he used the opportunity

1   to go back to cooking crack cocaine in his home when his wife

2   and children were not present.

3          So what I'm saying is, I think I cannot conclude

4   that he would not be a danger to the community if released.

5   I think there's a severe possibility that he could revert to

6   his old ways of criminal misbehavior, serious criminal

7   misbehavior in terms of drug distribution.  And he would,

8   therefore, be a threat to the community if released.

9          So I acknowledge he has lupus and needs a kidney.

10  He gets dialysis treatment three times a week at the Bureau

11  of Prisons.  Hopefully, the COVID-19 pandemic will begin to

12  subside.  He's gotten both vaccinations.  I'm just not

13  convinced that he's demonstrated extraordinary and compelling

14  circumstances.  And I think the Government has demonstrated

15  he would be a threat to the community if released.

16         So for all those reasons, the request for

17  compassionate release is respectfully denied.

18         Anything further?

19         MR. WITHERSPOON:  Nothing from the Government, Your

20  Honor.

21         MR. MACKENZIE:  No, sir, Your Honor.

22         THE COURT:  All right.  Thank you very much.

23  Appreciate the technology help, Kurt.  We didn't have any

24  satellite drops.  And we had good audio and visual.  We will

25  be in recess.

1          (Whereupon, proceedings are adjourned.)

2                    CERTIFICATE OF REPORTER

3

4          I, Karen V. Andersen, Registered Merit Reporter,

5     Certified Realtime Reporter for the State of South Carolina

6     at Large, do hereby certify that the foregoing transcript is

7     a true, accurate and complete Transcript of Record of the

8     proceedings.

9          I further certify that I am neither related to nor

10    counsel for any party to the cause pending or interested in

11    the events thereof.

12

13

14

15

16    Karen V. Andersen
      Registered Merit Reporter
17    Certified Realtime Reporter

18

19

20

21

22

23

24

25